IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**LETHA L. CAYWOOD,**                                       Case No. 3:17 CV 1725

      Plaintiff,                                              Judge Jeffrey J. Helmick

      v.                                                          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                          REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Letha L. Caywood ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 17, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in June 2014, alleging a disability onset date of May 5, 2014. (Tr. 303-10). Her claims were denied initially and upon reconsideration. (Tr. 223, 232, 240, 247). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 252). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on March 14, 2016. (Tr. 118-54). On May 24, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-27). The Appeals Council denied Plaintiff's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-8); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on August 17, 2017. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background and Testimony

Plaintiff was born in January 1981, making her 33 years old at her alleged onset date. (Tr. 303, 305). She had previously worked as a cashier, sales associate, file clerk, and childcare provider. (Tr. 125-28, 333).

At the March 2016 hearing, Plaintiff testified she lived with her parents. (Tr. 122). She had a driver's license, but had not driven in eight months due to her neurocardiogenic syncope. (Tr. 123).

Plaintiff testified she last worked at Kroger as a cashier, but left the job because she "couldn't concentrate." (Tr. 124). Plaintiff had "a hard time being able to focus and concentrate", she "get[s] lost", and "get[s] confused a lot." (Tr. 130). She also "had a hard time being able to ring the customers out in the big crowd [and that] started to make it hard for [her] to - - to concentrate." *Id.* Plaintiff later explained she initially stopped working at Kroger due to pancreatitis, but in the months before stopping, she missed work due to mental health issues. (Tr. 125, 141).

---

1. Plaintiff alleged disability due to both mental and physical impairments. *See* Tr. 332 (alleging disability based on major depressive disorder, chronic pancreatitis, and prescription drug addiction). She, however, only challenges the ALJ's evaluation of her mental impairments in this appeal. As such, the undersigned only summarizes the relevant medical records and testimony. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised are waived).

2

Plaintiff saw a counselor once a month, and a psychiatrist every eight weeks. (Tr. 131). Plaintiff had side effects from "some" of her medications, including dizziness and hunger. *Id.* She had symptoms of depression including heaviness in her back, fatigue, and sleeping during the day. (Tr. 133). Plaintiff testified she was nauseous from her pancreatitis and anxiety. (Tr. 143).

Plaintiff had a hard time concentrating. (Tr. 134). As an example, she noted her mother would tell her to do a job at home, but she would "get confused" and be unable to finish because she could not remember how her mother wanted the task completed. *Id.* As to the type of jobs her mother asks her to do, she cited vacuuming, dishes, and taking care of two dogs. (Tr. 134-35). She testified she sometimes forgets to take the dogs outside. (Tr. 135).

Plaintiff helped her mother with grocery shopping and testified she "tr[ies] to get out at least once a week". (Tr. 136). In addition to grocery shopping, sometimes Plaintiff went to her sister's house. (Tr. 138).

Plaintiff liked to read and watch television, but testified she had racing thoughts and difficulty focusing. (Tr. 138, 143-44). She also heard voices once or twice per day, and had visual hallucinations at least once per day. (Tr. 139). Plaintiff played games on a tablet (Tr. 144) ("you know, try to help tune things out"), checking it "at least three times per day" for about an hour and a half each time. (Tr. 144-45).

Relevant Medical Evidence

*Prior to Alleged Onset Date*

In October 2013, Plaintiff went to the emergency room for a psychiatric evaluation. (Tr. 625). She reported she always had depression, but it worsened after recently stopping pain medications she was taking for pancreatitis. *Id.* Plaintiff was diagnosed with, *inter alia*, depression

and an anxiety reaction. (Tr. 629). She was prescribed Xanax and instructed to follow up with her primary physician. *Id.*

The following month, plaintiff saw Mary L. Barmann, M.D. (Tr. 647). Dr. Barmann noted Plaintiff had been prescribed Citalopram the previous week, and Plaintiff "noticed a difference with meds but not quite to goal". *Id.*

Plaintiff also began mental health treatment at Valko & Associates starting in November 2013. (Tr. 840). David Bingham, PMHCNS-BC[2], noted Plaintiff reported past treatment for opioid addiction with Suboxone and that "every time she is tapered off the Suboxone she has increased anxiety and depression." *Id.*[3] Plaintiff also stated she isolated from others, "ha[d] to force[] herself to go to work", and "ask[ed] for work assignments that [would] keep her busy so she [did] not think too much." *Id.* Plaintiff had a lot of friends both at church and at work. (Tr. 842). On examination, Plaintiff was friendly and cooperative, with clear communication and normal thought content, but also anxious. *Id.* Mr. Bingham assessed mood disorder, not otherwise specified, and opioid use disorder. (Tr. 843). He continued Plaintiff on Celexa, increased her Amitriptyline dosage and started her on Vistaril. *Id.*

From December 2013 to June 2014, Plaintiff had several additional appointments at Valko & Associates. (Tr. 844-59, 1116-17). Notes from Mr. Bingham during this time period show Plaintiff often had a flat or depressed affect, and an anxious mood. *See* Tr. 848-54. A chronological record of appointments also shows Plaintiff had several counseling appointments with Marsha Manon, LPCC-S, LICDC-CS. *See* Tr. 1116-17.[4]

_____

2. Psychiatric Mental Health Clinical Nurse Specialist – Board Certified.
3. All of Mr. Bingham's treatment notes also include the name Tim R. Valko, M.D., Board Certified Psychiatrist, at the bottom. *See, e.g.,* Tr. 843, 852.
4. The notes from these counseling appointments are not part of the record.

4

*After Alleged Onset Date*

Plaintiff continued to treat with Valko & Associates after her alleged onset date. In May and June 2014, Plaintiff had an agitated and flat affect, and an anxious mood. (Tr. 856, 858). Plaintiff's medication was switched from Lexapro to Effexor (Tr. 857), and her Effexor dosage was later increased due to continued anxiety and depression symptoms (Tr. 859). Plaintiff had a flat affect and anxious mood, but her thought process, perceptions, memory/concentration, and insight/judgment were normal. (Tr. 858-59).

Also in June 2014, a state agency interviewer noted Plaintiff, accompanied by her mother, was "polite and cooperative", "had difficulty with eye contact" and "was very soft spoken." (Tr. 329).

In July 2014, Mr. Bingham noted Plaintiff had a flat affect and depressed mood, and that Plaintiff "says that she continues to be depressed." (Tr. 860-61). He prescribed a trial of Seroquel XR. (Tr. 861). In August, Plaintiff's mood and affect were normal, and she reported side effects from the Seroquel XR. (Tr. 862-63). She agreed to a trial of Abilify, and Mr. Bingham "encourage[d] [her] to restart psychotherapy." (Tr. 863). Later that month, Plaintiff's affect was anxious and her mood sad; she reported "not doing well", feeling "overwhelmed" by her anxiety, and that her medication was not controlling her issues. (Tr. 864-65). Mr. Bingham increased the Abilify dosage and added Clonidine "to reduce the physical sensations of her anxiety." (Tr. 865).

In September 2014, Plaintiff's mood and affect were normal, but she reported "not doing well". (Tr. 867-68). Specifically, she stated she had less anxiety, but continued depression. (Tr. 868). She reported "difficulty being around people, even supportive people." *Id.* Mr. Bingham added Prozac. *Id.* In October, Plaintiff again had normal mood and affect, but reported "having problems with anxiety when she has to go out around people." (Tr. 870). Mr. Bingham added

Buspar to be used as needed "when she needs to go to church." *Id.* She had discontinued Prozac due to side effects, and restarted Effexor XR. *Id.* Plaintiff had similar mental status findings in November, but also reported visual and auditory hallucinations. (Tr. 873) ("She says that she has had hallucinations for a long time but did not think she needed to talk about them."). Plaintiff reported "that overall her mood has improved." *Id.* Mr. Bingham increased Abilify. *Id.*

In December, Plaintiff saw Diane Hysell, M.D., at Valko & Associates. (Tr. 875-77). Her mood was anxious and she reported visual and auditory hallucinations. (Tr. 875-76). Dr. Hysell increased Plaintiff's Abilify dosage, decreased Elavil, and decreased Baclofen "since it is not approved for psychiatric reasons and it hasn't been helping her mood and it could cause hallucinations." (Tr. 876). Plaintiff stated "that overall her mood has improved." *Id.*

In January 2015, Dr. Hysell noted similar mental status findings. (Tr. 957-58). Plaintiff's speech was "clear and unpressured" and she "[made] good eye contact". (Tr. 958). Decreasing Baclofen made Plaintiff "less alert and tired", but Buspar "helps her when she goes out in crowds." *Id.* Plaintiff reported "a lot of ups and downs", and losing her temper. (Tr. 958). Plaintiff also reported "the amount of voices she is hearing has decreased", but "[s]he still feels like she is mistaking shadows for other things." *Id.* Dr. Hysell again modified Plaintiff's medications, increasing Clonidine and Abilify and decreasing Elavil "with the eventual hope that she will no longer require the medication in the future." (Tr. 959). Dr. Hysell noted similar findings at a February 2015 appointment, again specifically noting Buspar helped Plaintiff "when she goes out in crowds" and that her auditory hallucinations had decreased. (Tr. 961).

In March 2015, Plaintiff told Dr. Hysell she was experiencing dizziness. (Tr. 964). Dr. Valko decreased Abilify "but that did not seem to help". *Id.* Plaintiff also experienced an increase in auditory hallucinations and "the voices had totally gone before the decrease [in Abilify]." *Id.*

Dr. Hysell increased the Abilify, decreased Balofen, and instructed Plaintiff to "only take the [B]uspar if she really needs it." *Id.* Plaintiff returned the following month, where Dr. Hysell observed her "affect is flat but she makes good eye contact and sat comfortably in the chair throughout the appointment." (Tr. 969). She continued to have dizziness, but was on Meclizine "which she state[d] ha[d] helped tremendously." *Id.* Plaintiff reported "feeling discouraged", "worrying about money" and being "unable to get to church because she does not have a ride." *Id.* She denied hallucinations. *Id.* Dr. Hysell increased Plaintiff's Buspar, started Elavil, and decreased her Clonidine. *Id.*

In May 2015, Plaintiff told Dr. Hysell her anxiety and sadness was "about the same", but she was walking the dog and getting outside. (Tr. 979). She also reported therapy was going well and that she was trying to implement the strategies discussed. *Id.* In June, Plaintiff presented with quiet, slightly pressured speech. (Tr. 984). She reported "feeling better this past month as she feels her medication are finally clicking together since discontinuing the Clonidine." *Id.* She had "not been usually feeling anxious or sad", but "feels sad for about an hour a day randomly." *Id.* To avoid this feeling, she was trying to be active by walking her dog or doing dishes. *Id.* At both visits, Dr. Hysell continued Plaintiff's medications. (Tr. 980, 985).

In July 2015, Plaintiff saw Deborah Morgal, M.S.N., at Valko & Associates. (Tr. 986-88). On examination, Plaintiff had a flat/blunted affect, but otherwise unremarkable mental status examination. (Tr. 987). Ms. Morgal also noted "intermittent eye contact." (Tr. 988). Plaintiff reported she was "feeling better lately and feels like her mood is more upbeat", it "feels as if her life in general is going better", and she had not been as anxious. *Id.* Plaintiff also reported counseling had helped with her anxiety. *Id.* Ms. Morgal noted: "Because Letha is doing so well, no changes will be made to her medications at this time." *Id.*

7

In August, Plaintiff again had a flat affect and displayed intermittent eye contact. (Tr. 992). She was "doing well", with less anxiety, a stable mood, and no hallucinations. *Id.* Plaintiff reported "she gets to see her sister often which she enjoys", but had stayed home "due to being dizzy most of the time." *Id.* She had an appointment the following week to address the dizziness. *Id.*

Ms. Morgal observed Plaintiff had a blunted affect, and Plaintiff reported increased anxiety in September. (Tr. 1087). Plaintiff reported some visual and auditory hallucinations. *Id.* Ms. Morgal increased Plaintiff's Buspar dosage. *Id.* The following month, Plaintiff reported the Buspar increase was "tremendously beneficial with her anxiety but she does not always remember to take it." (Tr. 1091). She had no visual hallucinations, but had some auditory hallucinations. *Id.* Her mood was flat, her affect blunt, and she "showed minimal facial expressions". *Id.* Plaintiff reported interactions with her family:

> Letha states that she has been hanging out with her older sister more often. They go shopping with one another and recently picked up gifts for missionary children at the church they belong to. She has been getting out of the house 2-3 times per week and is now baking and cleaning to decrease her anxiety. She is still watching TV quite a bit but is conversing more with her father as they watch it together. She seems to really enjoy their talks.

*Id.* Ms. Morgal observed: "Because Letha is doing well, her medications and their doses will be kept the same." *Id.*

In November, Plaintiff presented with a blunt affect, and reported an "up and down mood". (Tr. 1095). She also reported increased anxiety and that she fainted a number of times. *Id.* A neurologist had diagnosed her with POTS. *Id.* Ms. Morgal observed Plaintiff's anxiety increase "seems more related to her health issues." *Id.* Ms. Morgal started to wean Plaintiff off Baclofen. *Id.* At her next appointment, Ms. Morgal noted Plaintiff had no difficulty weaning off Baclofen. *Id.* Plaintiff again had a blunted affect, reported continued auditory hallucinations, and discussed her physical health issues. *Id.* She noted these had "limited her actions but she has been going out

8

with her sister to do some shopping." *Id.* She also "talked about how they celebrate Christmas and she is looking forward to that." *Id.* Ms. Morgal continued Plaintiff's medications. *Id.*

Plaintiff saw Ms. Morgal in February 2016. (Tr. 1101-03). Plaintiff again had a blunted affect and reported she had been "up and down", and worried about her physical health issues. (Tr. 1103). Plaintiff was "doing things with family", "getting out of the house more . . . [and] trying to increase her activity level." *Id.* Ms. Morgal continued Plaintiff's medications. *Id.*

An appointment chronology reflects Plaintiff also attended counseling visits approximately monthly with Ms. Manon at Valko & Associates from June 2014 through March 2016. See Tr. 1114-17.[5]

*Opinion Evidence*

In June 2014, Mr. Bingham completed a form for the Social Security Administration. (Tr. 676-78). He noted Plaintiff had depression, anxiety, and panic attacks. (Tr. 677). She was oriented, but had a low frustration tolerance, and difficulty interacting with and little contact with people. *Id.* He noted Plaintiff had a partial response to treatment, and she was "unable to work at this time." (Tr. 678).

In August 2014, Plaintiff underwent a consultative psychological evaluation with Daniel Watkins, Ph.D. (Tr. 817-23). Plaintiff reported past part-time work as a cashier in May 2014, and prior full-time work from 2004 to 2011 as a supervisor at Kroger in Kentucky. (Tr. 819). "She finally stopped working because of her physical condition" and denied any difficulty getting along with coworkers, supervisors, or customers. *Id.* Plaintiff lived with her parents and was able to "perform the usual household chores with her physical limitations only." *Id.* She did dishes, shopped with her mother, but did not cook, or do yardwork, laundry, or any heavy cleaning. *Id.*

_____

5. Again, the notes from these visits are not part of the record.

"She sees her friends at home but does not go out", and attended church services "when she can – 'it's hit and miss.'" *Id.* "She was previously socially active with friends but now tends to isolate." *Id.* She had a pet dog that she cared for. *Id.* On examination, Dr. Watkins noted Plaintiff appeared "at least moderately anxious", but was cooperative, with good eye contact, logical thought process, and no indications of a thought disorder. (Tr. 819-20). Her mood was "depressed and anxious", with Dr. Watkins noting she presented as "acutely anxious". (Tr. 820). She was alert and oriented, and Dr. Watkins estimated her intelligence to be "within normal limits or better." (Tr. 820-21). For his functional assessment, Dr. Watkins opined Plaintiff had no limitation in the ability to understand, remember, or carry out instructions. (Tr. 822). He thought she would have "perhaps moderate limitation" in the ability to maintain attention, concentration, persistence, and pace due to her "complain[t]s that she is sometimes distracted by anxiety" and "she has difficulty focusing on a television program." *Id.* He opined she would have "moderate limitation" in the ability to respond appropriately to supervision and coworkers due to her presentation as acutely anxious, but was able to maintain some friend and family relationships, and she "presented as polite and socially appropriate." (Tr. 822-23). Plaintiff "should be able to cope with a low-pressure work setting adequately", but "would expect her to decompensate further under a very high stress work situation", and [e]xpect moderate limitation in a moderate pressure or typical work setting." (Tr. 823).

In September 2014, state agency psychologist Patricia Semmelman, Ph.D., evaluated Plaintiff's records. (Tr. 165-66). She opined Plaintiff had no understanding and memory limitations, but moderate limitations in the ability to maintain attention and concentration for extended periods, ability to work in coordination with or proximity to others without distraction, and ability to complete a normal workday and workweek without interruptions from

psychologically based symptoms. (Tr. 164-65). She noted Plaintiff could "sustain concentration and attention for routine tasks." (Tr. 165). Dr. Semmelman also noted Plaintiff would be moderately limited in her ability to interact appropriately with the general public, but not limited in her ability to get along with coworkers, or supervisors. (Tr. 165). She explained Plaintiff could "interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting" and "cope with the ordinary and routine changes in a work setting which is not fast paced or of has [sic] high production demands." (Tr. 165-66).

In September 2014, Ms. Manon and Mr. Bingham co-signed a medical source statement. (Tr. 813-15). They opined Plaintiff would be able to remember, understand and follow directions for simple tasks less than 80 percent, but more than 2/3 of the time because she "experiences confusion associated to the anxiety and depression." (Tr. 813). She would be able to stay on task less than two-thirds of the time due to "poor motivation, difficulty with ADLs." *Id.* She was unable to perform an average-paced job without reduction in productivity of more than twenty percent, compared to an unimpaired worker due to "poor motivation, easily overwhelmed." (Tr. 814). She would miss work one to three times per month due to psychiatric symptoms. *Id.* She would be unable to consistently interact in a manner appropriate to customer or employer expectations and would not be successful working with the public, co-workers, or the public. *Id.* In explanation, they noted she "avoids social contact" and has "[d]ifficulty being around people even in a supportive environment." *Id.* Finally, they opined Plaintiff could tolerate the stress or routine, unskilled or low-skilled work if she could take unscheduled absences or breaks as much as fifteen to twenty percent of the workday. (Tr. 815).

11

In December 2014, Dr. Valko completed a state agency questionnaire. (Tr. 836-38). He noted Plaintiff had ongoing hallucinations and struggled with her mood and affect. (Tr. 837). Plaintiff's impairments had decreased her interests, habits, and behavior. *Id.* Regarding social interactions, he noted "ongoing social issues d/t hallucinations." *Id.* Dr. Valko noted decompensation was "ongoing – DAILY." *Id.* Plaintiff had "minimal gains" from treatment and "struggle[d] in all areas with regard to stress. (Tr. 838).

In February 2015, state agency physician Jaime Lai, Psy.D., reviewed Plaintiff's records. (Tr. 197-98). She offered similar findings to Dr. Semmelman, and concluded Plaintiff could:

> maintain attention, make simple decisions, and adequately adhere to a schedule to perform tasks that do not require strict adherence to time limits and production standards. She would do best in a setting with few distractions and where she would be permitted occasional flexibility with changing break times or scheduled shifts during periods of increase psych symptomology.

(Tr. 197). She also explained Plaintiff's anxiety interfered with her social functioning and:

> [a]lthough the claimant would likely perform optimally in a setting that entails infrequent interaction with others, she has the capacity to relate adequately on a brief superficial basis with coworkers and supervisors, and infrequently with the public.

(Tr. 198). She also opined Plaintiff would need major changes explained beforehand and implemented gradually because her symptoms "may exacerbate in the face of perceived stressors". *Id.*

In February 2016, Ms. Manon wrote a letter to Plaintiff's attorney regarding Plaintiff's functioning. (Tr. 1112-13). Ms. Manon stated she had seen Plaintiff since November 2013. (Tr. 1112). She noted Plaintiff's hallucinations, and negative symptoms which had blunted her ability to show emotion. *Id.* ("She appears more upbeat that she reports feeling and often appears to be responding mechanically."). Ms. Manon noted Plaintiff

12

has become reclusive in that she has withdrawn from almost all social contact outside of her family. She does not attend church regularly, cannot work, and spends most of her time in her home with her parents and 2 dogs. She has basically withdrawn from her life as it was prior to her illness and has become fearful of any social contact. Her family has been remarkably supportive, even sacrificing their time away from home to keep her company. She is particularly close to her parents and sisters.

*Id.* In Ms. Manon's opinion, Plaintiff "cannot function in any position which would exert any further stress on her emotionally" and "[a]ny contact with people she is not very familiar with, and comfortable around, could put further stress on her emotionally, causing her to incur absences and/or an emotional reaction." (Tr. 1113). Ms. Manon opined that "[e]ven routine assignments would not preclude an emotional reaction" as "[t]he intensification of anxiety she describes prior to leaving her home for appointments would be amplified if she were to be anticipating a work environment." *Id.* Plaintiff "could handle constructive criticism superficially", but "would tend to ruminate on and internalize it as denigration of her self-worth." *Id.*

## VE Testimony

A VE also testified at Plaintiff's hearing before the ALJ. (Tr. 145-53). She testified that an individual limited in the way the ALJ found Plaintiff to be could perform jobs existing in significant numbers in the national economy. (Tr. 148-51).

## ALJ Decision

The ALJ first found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019, and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 15). Plaintiff had severe impairments of depression, anxiety, psychotic disorder, chronic recurrent pancreatitis, pancreas disorder, chronic fatigue, neurogenic syncope, pulmonary embolism, and obesity. (Tr. 16). None of these impairments, however, met or equaled the severity

of a listed impairment. *Id.* The ALJ then concluded Plaintiff had the mental residual functional capacity to:

> understand, remember, and carry out simple, routine, and repetitive tasks but not at a production rate pace (e.g. assembly line work). The claimant can understand, remember and carry out simple work related decisions. Changes should be well explained and introduced slowly. The claimant can occasionally interact with supervisors. The claimant can superficially interact with coworkers and the public. "Superficially" means the ability to greet people, refer the coworkers/public to other co-workers regarding coworkers/customers' demands or requests, answer question about time of day, and give directions to the bathroom. Superficial interaction would not involve claimant dealing directly with demands or problems of the coworker/customer.

(Tr. 19, 23).[6] The ALJ found Plaintiff was unable to perform any past work, but could perform other jobs existing in significant numbers in the national economy. (Tr. 24-27). Therefore, the ALJ found Plaintiff not disabled from her alleged onset date through the date of the decision. (Tr. 27).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

---

6. Plaintiff's physical RFC changed as of May 1, 2015, but her mental RFC remained the same. *Compare* Tr. 19, *with* Tr. 23.

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

15

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff challenges the ALJ's analysis of the opinion evidence in her case, including that from treating providers, a consultative examiner, and the state agency reviewing psychologists. The Commissioner responds that the ALJ's decision is supported by substantial evidence. For the reasons discussed below, the undersigned recommends the decision be affirmed.

*Treating Providers*

Plaintiff first challenges the ALJ's treatment of Mr. Bingham and Ms. Manon's September 2014 opinion, and Ms. Manon's February 2016 opinion.[7]

Under the regulations, a treating physician's opinion is entitled to controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007). The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* This rule, however, applies only to treating physicians. Only "acceptable medical sources" can be considered a treating source whose medical opinion may be entitled to controlling weight under the treating physician rule. SSR 06-03p, 2006 WL 2329939,

---

7. Plaintiff also briefly references Dr. Valko's opinion in a footnote, but notes "the record does not indicate whether he independently evaluated Ms. Caywood" and that he "does not appear to be a treating physician, as defined by the regulations." (Doc. 12, at 16). She does not independently challenge the ALJ's treatment of Dr. Valko's opinion. Additionally, while Plaintiff cites Mr. Bingham's June 2014 report, she notes that "since the September 2014 [opinion] provided more specific vocational limitations, this brief will focus on the September report." (Doc. 12, at 20 n.6). Again, Plaintiff does not explicitly challenge the ALJ's treatment of Mr. Bingham's June 2014 opinion as reversible error. Therefore, the undersigned focuses on the opinions explicitly challenged by Plaintiff.

16

at *1[8]; *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014). Nurses and counselors are not "acceptable medical sources" under the regulations. *See* 20 C.F.R. §§ 404.1513(a), (d); 416.913(a), (d). Therefore, such opinions are not entitled to the same deference due a treating physician's opinion. *See, e.g., Dudich v. Colvin*, 2013 WL 5939775, at *10 (N.D. Ohio) (clinical nurse specialist not among list of "acceptable medical sources" entitled to deference under the treating physician rule). Such opinions fall within the category of information provided by "other sources".

The regulations recognize that information from such other sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment[] and how it affects the ability to function." SSR 06-03p, 2006 WL 2329939, at *1. Therefore, opinions from these sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. The same factors applied to acceptable medical sources apply to opinions from these other sources. *Id.* at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (listing factors of length and extent of treatment relationship, consistency, supportability, how well explained an opinion is, area of specialty, and "[a]ny other factors that tend to support or refute the opinion."); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). "[T]he Commissioner has broad discretion

---

8. The Social Security Administration rescinded SSR 06-03p effective March 2017. Soc. Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5845 (January 18, 2017). Within these same revisions, Clinical Nurse Specialists were added to the list of acceptable medical sources. *See id.*; *see also* 20 C.F.R. §§ 404.1502(a)(7); 416.902(a)(7) (listing "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title" as an acceptable medical source for claims filed after March 27, 2017). However, the undersigned must apply the rules in effect on the date of the ALJ's decision. *See* 82 Fed. Reg. 5845 (noting new rules apply to claims filed after March 2017).

in weighing such an opinion" from a non-acceptable medical source. *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015).

Preliminarily, neither Ms. Manon nor Mr. Bingham is an "acceptable medical source" under the regulations. *See* 20 C.F.R. §§ 404.1513(a), (d); 416.913(a), (d). As such, SSR 06-03p, 2006 WL 2329939, provided the appropriate framework for evaluating their opinions. The ALJ here discussed these two opinions:

> In a February 2016 statement, Marsha E. Manon stated the claimant is unable to work. She also said the claimant is unable to function in any position that would exert any further stress on her emotionally. She also opined the claimant should not have contact with people with whom she is unfamiliar and should avoid workplace stress. The undersigned gives this statement partial weight because whether a claimant can work is a matter reserved for the Commissioner. Additionally, she has suggested she is able to interact with people with whom she is unfamiliar, as she goes shopping and attends church on a regular basis[]
>
> In a September 2014 medical source statement, Ms. Manon suggested the claimant would be able to remember, understand, and follow directions for simple tasks between 2/3 and 80% of the time. She also stated the claimant would be able to stay on task 2/3 of the time. She also estimated the claimant would be absent, late, or have to leave early 1 to 3 times a month and would be unable to interact with the public, coworkers, or supervisors. She further stated the claimant would be off-task 15-20% of the workday. The undersigned gives this statement little weight because the record as a whole suggests the claimant is more capable than Ms. Manon suggested. The claimant testified she goes shopping with her mother on a regular basis, which suggests she is capable of at least some social contact.

(Tr. 21) (citations omitted).[9]

The undersigned finds the ALJ adequately explained she was discounting these opinions because they were not fully supported by the evidence in the record, and the ALJ's decision to discount these opinions is supported by substantial evidence.

---

9. Plaintiff correctly points out that the ALJ misidentified this opinion as offered solely by Ms. Manon, when it was signed by both Ms. Manon and Mr. Bingham. *See* Tr. 815. Both Ms. Manon and Mr. Bingham are "other sources" under the regulations and are analyzed in the same manner, however, and Plaintiff presents no specific argument that the misidentification was reversible error in and of itself.

First, the ALJ properly stated that Ms. Manon's opinion that Plaintiff was unable to work was not entitled to weight because such issues are reserved for the Commissioner. *See Kidd v. Comm'r*, 283 F. App'x 336, 341 (6th Cir. 2008) ("[T]he ultimate issue of disability is reserved to the Commissioner."); *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c).

Second, the ALJ's decision to discount both opinions based on Plaintiff's daily activities is proper and supported by the record. Plaintiff argues the ALJ overstated her daily activities and abilities, arguing that Plaintiff does not leave the house alone, consistent with these opinions. As a reason for giving the social interaction limitations in these opinions "partial" or "little" weight, the ALJ cited Plaintiff's testimony that she goes shopping with her mother. (Tr. 21-22) (citing Tr. 136, 138). Plaintiff's ability to shop with someone else is also supported elsewhere in the record. *See* Tr. 958, 961, 1091, 1099, 1103.

Plaintiff also contends the ALJ misinterpreted these opinions. Specifically, Plaintiff contends the ALJ interpreted these opinions as suggesting Plaintiff cannot have *any* contact with others (and rejected them on that basis), while Ms. Manon's opinion instead stated that contact with unfamiliar people "would result in increased absences or decreased effectiveness" and "that even working around regular coworkers would be draining". (Doc. 12, at 18); *see also id.* at 21 ("CNS Bingham and Counselor Manon never suggested that Ms. Caywood could not have some contact with others but rather, they stated Ms. Caywood could not interact consistently with and hence, would not be successful in working with the public, co-workers, or supervisors."). The ALJ, however, gave "partial" weight to Ms. Manon's February 2016 opinion, and her ultimate RFC accounted for significant difficulties interacting with others. Specifically, the RFC provided Plaintiff could only "occasionally" interact with supervisors, and only "superficially interact with coworkers and the public." (Tr. 19). The ALJ defined superficial interaction in great detail:

> "Superficially" means the ability to greet people, refer the coworkers/public to other co-workers regarding coworkers/customers' demands or requests, answer questions about time of day, and give directions to the bathroom. Superficial interaction would not involve claimant dealing directly with demands or problems of the coworker/customer.

*Id.* That is, the ALJ found Plaintiff had significant social interaction limitations, but they were not as severe as opined by Ms. Manon as to prevent work. The ALJ's statement, that Plaintiff's ability to go shopping with her mother "suggests she is capable of at least some social contact" (Tr. 22) is reasonable and supported by the record. *See* Tr. 136, 138 (hearing testimony); Tr. 958 (January 2015 notation that Buspar "helps her when she goes out in crowds"); Tr. 961 (February 2015 notation that "the Buspar helps her when she goes out in crowds"), Tr. 1091 (October 2015 notation that Plaintiff "has been getting out of the house 2-3 times per week" and had been shopping with her sister, and "recently picked up gifts for missionary children at the church they belong to".); Tr. 1099 (December 2015 notation that "she has been going out with her sister to do some shopping"); Tr. 1103 (February 2016 notation that Plaintiff was "getting out of the house more").

As additional support for her conclusion regarding Plaintiff's social interaction limitations, the ALJ noted "the fact that the claimant was able to interact with the field office work[er] without problems further supports the social interaction limitations described above." (Tr. 22). Further, the ALJ cited "several occasions" in which Plaintiff "reported her symptoms improved with medication and counseling." (Tr. 20) (citing Tr. 852 (March 2014 – "says she is doing much better"); Tr. 958 (January 2015 – "Letha reports that the Buspar helps her when she goes out in crowds"); Tr. 984 (June 2015 – "She is feeling better this past month as she feels her medications are finally clicking together[.]"); Tr. 988 (July 2015 – reporting "feeling better lately", that her "medications are finally working well for her" and she "has been seeing Marcia [Manon] on a regular basis which has also been improving her anxiety"); Tr. 992 (August 2015 – "She continues

20

to attend monthly therapy sessions with Marcia [Manon] which she thinks is helping her.")). This is a valid reason for assigning less weight to an opinion. *See, e.g., Smith v. Comm'r of Soc. Sec. Admin*, 564 F. App'x 758, 764 (6th Cir. 2014) (improvement with treatment/medication undermines claim of total disability). As a whole, this evidence provides support for the ALJ's conclusion that Plaintiff's retained some ability to interact with unfamiliar individuals, and was not as limited as opined by Ms. Manon and Mr. Bingham.

Mr. Bingham and Ms. Manon also opined Plaintiff had limitations in the ability to concentrate and stay on task. (Tr. 813). The ALJ explained she gave this opinion "little weight because the record as a whole suggests the claimant is more capable than Ms. Manon suggested." (Tr. 22). One page prior in her decision, the ALJ explained that Plaintiff

> has also recently described activities of daily living that suggest she is capable of performing work involving simple, routine, and repetitive tasks and decisions and limited social interaction such as shopping with her sister, baking, cleaning, playing games on her Kindle, taking care of two young puppies, and attending church.

(Tr. 21) (citing Tr. 124-45, 1091, 1099). Specifically, Plaintiff testified she played a game on her tablet "at least three times per day" for about an hour and a half each time. (Tr. 144-45). This inconsistency in the record is a supported reason for giving less weight to this opinion. *See* 20 C.F.R. §§ 404.1527(c); 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give that medical opinion."). And it is supported by substantial evidence elsewhere in the record such as mental health treatment notes repeatedly indicating Plaintiff's attention and concentration were intact. *See* Tr. 857, 859, 861, 863, 868, 870, 873, 876, 958, 961, 964, 967, 972, 977. 982, 987, 991, 1086, 1090, 1094, 1098, 1102).

Moreover, at the end of her analysis, the ALJ cited Plaintiff's "conservative treatment history" as "not consistent with total disability." (Tr. 22). This is an appropriate consideration. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the

21

records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a "'good reason' for discounting a treating source opinion.").

Further, as discussed in greater detail below, the ALJ's RFC determination and analysis of Plaintiff's subjective reports was also supported by the opinions of Dr. Watkins and the state agency physicians. The undersigned therefore recommends the court find the ALJ did not err, as she adequately explained the weight ascribed to these "other source" opinions and her reasons for doing so are supported by substantial evidence.

*Consultative and Reviewing Physicians*

Plaintiff also contends the ALJ erred in her analysis of the opinions of consultative examiner Dr. Watkins, and state agency reviewing physicians Drs. Semmelman and Lai.

Non-examining sources are physicians, psychologists, or other acceptable medical sources that have not examined the claimant, but review medical evidence and provide an opinion. 20 C.F.R. §§ 404.1502, 416.902. The ALJ will consider the findings of these non-examining sources as opinion evidence, except as to the ultimate determination about whether Plaintiff is disabled. § 20 C.F.R. §§ 404.1527, 416.927. An ALJ uses the same five factors for examining the opinions of non-examining sources as he does for treating sources. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

The ALJ explained her consideration of these opinions:

As for the opinion evidence, the undersigned gives the opinions of the State agency psychological and medical consultants great weight and adopts their opinions. The State agency consultants are licensed professionals who have extensive experience assessing disability claims. They also had the opportunity to assess the majority of the evidence of record, allowing them to obtain a comprehensive, longitudinal assessment of the claimant's level of functioning. . . .

The undersigned also gives great weight to the opinion of psychological consultative examiner Daniel K. Watkins, Ph.D., who opined the claimant is be [sic] able to understand, remember, and perform simple tasks but would have moderate limitation responding appropriately to supervisors, coworkers, and

22

workplace pressure. This opinion is consistent with the claimant's reported activities of daily living.

(Tr. 21) (citations omitted).

Plaintiff first argues the ALJ improperly evaluated the opinion of reviewing physician Dr. Lai. She first argues, as she does with regard to the treating providers, that the ALJ overstated Plaintiff's activities. For the reasons stated above, this argument is not well-taken.

Second, she contends Dr. Lai's opinion is "more limiting than identified by the [ALJ]", and the ALJ stated she was "adopt[ing]" that opinion, but failed to incorporate all aspects of that opinion. (Doc. 12, at 24) (citing Tr. 197). Specifically, Plaintiff contends the ALJ failed to incorporate Dr. Lai's opinions that Plaintiff could "adequately adhere to a schedule to perform tasks that do not require strict adherence to time limits and production standards" and "would do best in a setting with few distractions and where she would be permitted occasional flexibility with changing break times or scheduled shifts during periods of increased psych symptomology." (Tr. 197). First, the undersigned finds the ALJ's restriction to "simple, routine, and repetitive tasks but not at a production rate pace" (Tr. 18) adequately encompasses Dr. Lai's first opinion regarding time limits and production standards. Second, the undersigned agrees with the Commissioner's contention that Dr. Lai's opinion about the work environment in which Plaintiff would "do best" is not necessarily an RFC limitation. This is so because the RFC is defined as "the most you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945. *See, e.g., Litwin v. Colvin*, 2016 WL 487707, at *3 (W.D. Wash.) ("[T]he ALJ's RFC assessment need not address how a claimant would 'do best.'") (citing SSR 96-8p, 1996 WL 374184, at *1), *report and recommendation adopted by* 2016 WL 525488. As the *Litwin* court persuasively explained, such limitations "need not be accounted for in the RFC assessment, because they were written as recommendations for

an optimal work environment, rather than requirements." 2016 WL 487707, at *3. Therefore, there is no error in the ALJ "adopting" Dr. Lai's opinion without incorporating this particular limitation.

State agency and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i); 416.927(e)(2)(i). *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) ("State agency medical consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating ... source.")

As to Dr. Watkins, Plaintiff contends his opinion "also showed greater limitation in Ms. Caywood's ability to handle stress". (Doc. 12, at 24) (citing Tr. 823). Dr. Watkins opined Plaintiff "should be able to cope with a low-pressure work setting adequately." (Tr. 823). Plaintiff contends this is inconsistent with the ALJ's RFC. However, an ALJ is not required to adopt wholesale a medical opinion, even one to which she assigns "great weight." *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Additionally, the ALJ reasonably accounted for Dr. Watkins's opinion that Plaintiff required a "low-pressure" work setting. The RFC included limitations to "simple, routine, and repetitive tasks but not at a production rate pace (e.g. assembly line work)", and "simple work related decisions"; it also required changes to be "well-explained and introduced slowly." (Tr. 18-19). Thus, the undersigned finds no error in the ALJ's consideration of Dr. Watkins's opinion.

24

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB supported by substantial evidence and recommends the decision be affirmed.


 s/James R. Knepp II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).